UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KRISTIE MONTALVAN, *as parent and natural guardian of S.M.*, *et al.*,

Plaintiffs,

-v-

DAVID C. BANKS, *in his official capacity as Chancellor of New York City Department of Education*, *et al.*,

Defendants.

22 Civ. 8541 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Kristie Montalvan, individually and on behalf of her nine-year-old daughter, S.M., brings this action against the New York City Department of Education and its Chancellor, David C. Banks (together, the "Department"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and Article 89 of the New York State Education Law, N.Y. Educ. Law § 4401 *et seq.*  Montalvan seeks review of a June 6, 2022 administrative decision of a State Review Officer (the "SRO") which, reversing an award by an Impartial Hearing Officer ("IHO") of compensatory services, held (1) that the IHO lacked jurisdiction over Montalvan's due process complaint challenging the remote instruction offered to her daughter, on the ground that Montalvan's was a "systemic" grievance, and, in the alternative, (2) that Montalvan had failed to exhaust other remedies before she initiated state administrative proceedings.  The parties have cross-moved for summary judgment.

For the reasons that follow, the Court agrees with Montalvan that (1) the IHO had jurisdiction to determine whether S.M. had been provided a free appropriate public education ("FAPE") and did not have a valid basis to avoid resolving that claim; and (2) Montalvan was

not required to exhaust other remedies before filing her due process complaint.  Accordingly, the

Court grants summary judgment for Montalvan on those aspects of her claim.  However, because

the SRO did not reach the issue of whether S.M. had been denied a FAPE, or address the parties'

arguments as to the adequacy of the implementation of S.M.'s individualized education program

("IEP"), the Court remands those issues for consideration in the first instance.

I.      **Background**[1]

    A.      **Facts**

        1.      **S.M.'s Background**

S.M., age nine, has autism, hypertonia, and apraxia.[2]  AR 2, 29, 625.  She lives with her

parents, her two brothers, and the family's two dogs.  AR 623.  Her mother, Kristie, the plaintiff

---

[1] The facts which form the basis of this decision are taken from the parties' pleadings and their submissions in support of and in opposition to the instant motion—specifically, Montalvan's Rule 56.1 statement, Dkt. 21 ("Pl. 56.1"); Peter G. Albert's declaration in support of Montalvan's motion for summary judgment, Dkt. 23 ("Albert Decl."), and attached exhibits; the Department's Rule 56.1 statement, Dkt. 34 ("Def. 56.1"); and the administrative record from the proceedings below and attached exhibits, Dkt. 18 ("AR"), including, *inter alia,* the transcript from the hearing before the IHO ("IHO Tr."); the written decision of the IHO ("IHO Dec."); and the written decision of the SRO ("SRO Dec.").  For exhibits and briefs with both internal and Bates-stamped numbering, the Court cites the Bates-stamped page numbers.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. AR Civ. P. 56(c).").

[2] Autism is "a developmental disability significantly affecting verbal and nonverbal communication and social interaction," often marked by "engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and

here, is a state employee who assists people with developmental disabilities; her father, Christopher, is a handyman. AR 798. Like many nine-year-olds, S.M. is a "sassy girl," who "loves glitter, the color pink, and sparkly things." AR 577, 798. Also like many nine-year-olds, S.M. can be "very stubborn," and "doesn't like to be pushed to do things." AR 798. Due to her disabilities, S.M. is nonverbal. AR 624, 636. To communicate, she uses a touchscreen device, much like an iPad, to tap images (of, for instance, her favorite Disney toys) and words (such as "hello" and "goodbye") that are then spoken aloud. AR 458–59, 577.

### 2.    S.M.'s Relevant Educational History

In March 2020, S.M. was age six, and enrolled in a special-education kindergarten class in P.S. 37R, a public school in Staten Island. AR 626–27. Her class had eight students, one teacher, and one teaching assistant (in special-education terms, an "8:1:1 classroom"). AR 770. She was also receiving various related services on a one-to-one basis, including occupational therapy, physical therapy, and speech-language therapy. AR 417–19.

On March 15, 2020, as a result of the rapidly encroaching COVID-19 pandemic, S.M.'s school closed to in-person instruction. Pl. 56.1 ¶ 8; Def. 56.1 ¶ 8. The next day, Governor Cuomo issued Executive Order 202.4, closing all New York schools until April 1, 2020. N.Y. Exec. Order No. 202.4, N.Y. Comp. Codes AR & Regs. tit. 9, § 8.202.4. That date was later pushed back to April 15, 2020, N.Y. Exec. Order No. 202.13, N.Y. Comp. Codes AR & Regs. tit. 9, § 8.202.13, and pushed back again to May 15, 2020, N.Y. Exec. Order No. 202.18, N.Y. Comp. Codes AR & Regs. tit. 9, § 8.202.18. Finally, on May 1, 2020, Governor Cuomo announced the closure of all New York schools for the remainder of the school year. N.Y. Exec.

---

unusual responses to sensory experiences." 34 C.F.AR § 300.8(c)(1)(i). Hypertonia and apraxia are neurological conditions that impair motor and speech functions. AR 397–98.

Order No. 202.28, N.Y. Comp. Codes AR & Regs. tit. 9, § 8.202.28.  Like other schools across the nation, P.S. 37R sought to provide remote instruction to its students throughout this tumultuous period.  Pl. 56.1 ¶ 9; Def. 56.1 ¶ 9.

For S.M., COVID-19 changed more than the mode of instruction.  As a result of her disabilities, she was unable to participate in online classes.  As Montalvan testified, "remote learning was not working for" S.M.  AR 649.  She could not "sit still in front of the computer without a lot of support."  AR 636.  And "in a home with working parents and two other children," neither parent could serve as a "one-to-one para[professional] for her."  AR 636–37.  As a result, S.M. received little, if any, virtual instruction.  Even when schools partially reopened in the summer to provide in-person therapy services, S.M. was unable to attend (save for two days in July 2020) due to the lack of door-to-door transportation.  AR 438, 483, 639–40.[3]  Montalvan described her daughter's deterioration over this period as follows:

> To put it frankly, I watched my child wither away, and I just watched all the progress I had spent years . . . — from Early Intervention to [preschool] to school . . . — everything was like for nothing, because I watched a child completely withdraw from everything, and just start horrible [stimming] behaviors, and throwing herself on the ground, and not wanting to participate socially with her siblings.  And it was just a really traumatic time for [S.M.] and for our family, and we're still dealing with the loss.

AR 643–44.[4]

---

[3] The SRO, citing Montalvan's testimony before the IHO, stated that "[d]uring summer 2020, . . . the district provided [special-education] services remotely."  AR 4 (citing AR 637–39).  This statement is incorrect, however, insofar as it omits the fact that some in-person services became available that summer on a limited basis.  It is undisputed that S.M. did not receive such in-person instruction.  As Montalvan testified, "at some point in July," related services "beg[a]n taking place in person again," but S.M. was unable to attend because "it was not possible for [Montalvan] to bring [S.M.] to" school given her own work obligations.  AR 639–40.

[4] The term "stimming" was misspelled in the transcript as "stemming."  Stimming refers to "self-stimulatory behavior that is marked by a repetitive action or movement of the body (such as repeatedly tapping on objects or the ears, snapping the fingers, blinking the eyes, rocking from

The next year brought some improvement, albeit slight at first. In September 2020, when S.M. began first grade, she moved into a class with 12 students, one teacher, and one teaching assistant (a "12:1:1 classroom"). AR 485–86.[5] At this time, P.S. 37R utilized a "blended learning" model, in which S.M. (and half her class) were in-person one week and then remote the next. AR 184, 228–29, 486. Although S.M. now had a one-to-one paraprofessional to assist her during the school day, the paraprofessional could only support S.M. remotely when S.M's classes were online. AR 489–90, 637. And even when S.M. was scheduled for in-person instruction, Montalvan testified that "very strict closure and contact tracing rules" meant there were "some months where [S.M.] attended as little as one to two days" of school. AR 641. Since February 2021, however, S.M. has been able to attend school in-person, full time. AR 511.

### 3.   S.M.'s IEP

On April 6, 2020, just under a month after S.M.'s school closed, S.M.'s Committee on Special Education ("CSE") met virtually to conduct its annual review of S.M.'s individualized education program ("IEP"), to assure that S.M. stood to receive a free appropriate public education ("FAPE"). AR 769; *see also* AR 769–88 (S.M.'s 2020 IEP).[6] At that time, S.M.'s

---

side to side, or grunting), and is typically associated with certain conditions (such as autism spectrum disorder)." STIMMING, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2012).

[5] Montalvan's Local Rule 56.1 statement erroneously asserts that S.M. was age eight in the 2020–21 school year. Pl. 56.1 ¶ 1. As the Department notes, S.M. was born on January 24, 2014, Def. 56.1 ¶ 1 (citing AR 724, 728, 946), and was thus age six when the school year began (in September 2020) and age seven when it ended (in June 2021).

[6] The IDEA requires each state that accepts federal education funds to provide all disabled children within its jurisdiction with a FAPE. 20 U.S.C. §§ 1412(1), 1413(a). To meet this goal, each eligible child has her Committee on Special Education ("CSE"), comprised of school officials, teachers, and their parents, which is tasked with developing an annual individualized

CSE comprised Montalvan, S.M.'s teacher, three of S.M.'s therapists, and a district

representative. AR 788. At its April meeting, the CSE adopted a revised IEP for S.M., which

took effect the following day, April 7, 2020. AR 769.

The IEP recognized that S.M. "requires a highly-structured program with added adult

supervision and a low student[-teacher] ratio." AR 774. It provided that S.M. was to have a "1:1

health paraprofessional in school," due to "safety concerns and [the] high risk of injury" if S.M.

were unaccompanied. AR 773–74. It set goals for S.M. to meet over the next year, such as

"solv[ing] simple addition problems," safely navigating the "stairs . . . with one hand on a rail,"

and consistently participating in a "morning routine" by "hanging [up] . . . her jacket and

backpack, and placing a note book in a tray." AR 776–77. To meet these goals, S.M. was

placed in a specialized class and guaranteed five additional hours of one-on-one occupational,

physical, and speech therapy per week. AR 780–81. Because S.M. "needs special transportation

service[s]" to travel to school, she was promised pick-up would occur "from the closest safe curb

location" near her home. AR 785. She was also to "receive the same special education

program" in July and August (an "extended year") to ensure her "academic, social, and

communication skills" do not "regress" over the summer. AR 782.

The IEP made little mention of COVID-19 and no mention of remote instruction. The

one substantive reference to the pandemic came in the context of S.M.'s speech therapy: "Group

mandate was recommended to increase socialization, though due to the recent COVID-19

pandemic and school closure, her mother requested that her mandate continue as individually,

and mandate change will be re-visited upon the school's re-opening in the future." AR 774.

---

education program ("IEP") to meet the child's "educational needs." 20 U.S.C. §
1414(d)(1)(A)(i)(II)(bb), (d)(1)(B).

B.    **Administrative Proceedings**

1.    **Due Process Complaint and Impartial Hearing**

On August 14, 2020, five months after S.M.'s school closed, Montalvan filed a due

process complaint with the Department.[7] AR 707; *see also* AR 707–09 (Montalvan's

complaint).  The complaint centered on two allegations.  First, it alleged that S.M.'s school

district "unilaterally, substantially, and materially altered [S.M.'s] 'status quo' educational

program" by "alter[ing] the location of where [S.M.] was to receive services" from "a school

classroom to . . . [her] home."  AR 707.  Second, it alleged that the Department had "fail[ed] . . .

to provide [S.M.] a FAPE since mid-March 2020."  AR 708.  In the complaint, Montalvan

sought, *inter alia*, "an extensive independent evaluation of [S.M.] to determine the need for

compensatory services" and "a new Committee on Special Education/IEP Meeting to review" the

same, "an interim order requiring [S.M.'s] School District to immediately implement [S.M.'s]

IEP by reopening [her] school," "an interim order that [S.M.'s] School District has denied [S.M.]

a FAPE," and a "determin[ation] [of] appropriate compensatory services [for S.M.] due to the

---

[7] Under the IDEA, a parent has recourse to various formal and informal mechanisms to resolve disputes related to her child's education.  Relevant here, one such mechanism permits a parent to file a "due process complaint" with the state's educational agency.  *See* 20 U.S.C. § 1415(b)(6). Such a complaint initiates an "administrative challenge unrelated to the concept of constitutional due process."  *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).  If the parent's concerns cannot be resolved at a "[p]reliminary meeting," 20 U.S.C. § 1415(f)(1)(B)(i), the matter proceeds to a "due process hearing" before an Impartial Hearing Officer ("IHO"), *id.* § 1415(f)(1)(A); *see also id.* § 1415(f)(3)(A)(i), who must "determin[e] . . . whether the child received a [FAPE]," *id.* § 1415(f)(3)(E)(i); *see also* N.Y. Educ. Law § 4404(1)(a).  The IHO's decision can be appealed by either party to a State Review Officer ("SRO"), who must "conduct an impartial review" of the IHO's "findings and decision."  20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2).  "Any party aggrieved by" the SRO's decision "ha[s] the right" to seek judicial review by filing a civil action in state or federal court.  20 U.S.C. § 1415(i)(2)(A); *see also* N.Y. Educ. Law § 4404(3)(a).

denial of FAPE." AR 708–09. The case was assigned to Impartial Hearing Officer ("IHO")
Randy Glasser.

Motions practice, and orders from IHO Glasser, followed. On August 31, 2021, IHO
Glasser found S.M. was entitled to an independent educational evaluation ("IEE") at public
expense. AR 127; *see also* AR 119–27 (full order). On September 30, 2021, IHO Glasser
ordered the Department to "provide/fund" S.M.'s "program and services," pursuant to her IEP,
during the pendency of the administrative and judicial proceedings. AR 115; *see also* AR 107–
15 (full order). On December 2, 2021, IHO Glasser dismissed Montalvan's complaint in part,
holding that her request for an order reopening S.M.'s school was moot in light of P.S. 37R's
return to full-time in-person instruction. AR 104–05. Left standing was Montalvan's claim for
compensatory education based on the alleged denial of a FAPE.

On January 6, 2022, to determine the adequacy of S.M.'s education throughout the
COVID-19 period, IHO Glasser heard evidence from five witnesses. AR 400–663 (full
transcript). On its direct case, the Department called Ashley Deluzio, S.M.'s special-education
teacher from September 2021 onward. AR 443. On her direct case, Montalvan testified, as did
Alexis Levine, an occupational therapist; Lindsay Kaffl, a speech language pathologist; and
Victor Santamaria, a physical therapist. AR 523 (Levine), 560 (Kaffl), 590 (Santamaria), 623
(Montalvan). Both parties submitted a post-hearing brief. AR 62–77 (Montalvan), 78–90 (the
Department).

On February 24, 2022, IHO Glasser issued her findings of fact and decision. AR 22–53.
The opinion is difficult to parse, as it appears to reach two conclusions that are in tension.

First, IHO Glasser found that Montalvan's complaint "did not allege that [S.M.] failed to
receive instruction and/or services when school was closed due to the pandemic, but rather,

[alleged that] the way in which the instruction was provided, e.g., remotely, constituted a failure to implement [S.M.'s] IEP." AR 40. Such a claim, she held, necessarily failed, because the Department had acted pursuant to federal and state guidance to the effect that a "FAPE may include, as appropriate, special education and related services provided through distance instruction." AR 41. As a result, she concluded, "the District did in fact provide a FAPE to [S.M.] from March 2020 through the 2020/2021 school year." AR 52.

Second, IHO Glasser held that S.M. was entitled to compensatory education due to a "denial of FAPE" during "the Summer of 2020." AR 48. "[T]he classes and services missed by [S.M.] during the Summer of 2020," she stated, "add up to more than a 'handful' of sessions, and thus the denial of FAPE is more than *de minimis*." AR 48. Although she could not "state with certainty that [S.M.'s] regression resulted from the District's provision of remote, instead of in person instruction during the COVID-19 Pandemic," she found that "the District knew that [S.M.] failed to receive more than a *de minimus* [sic] educational benefit, and is therefore obliged to correct the situation." AR 48. She thus held S.M. entitled to a compensatory award equal to the classes and services she was supposed to receive in summer 2020. AR 47, 52.

### 2.    Appeal to the State Review Officer

Both parties timely appealed IHO Glasser's decision to a State Review Officer ("SRO"). AR 929–38 (Department's notice of appeal), 941–50 (Montalvan's notice of cross-appeal). The appeal was assigned to SRO Carol H. Hauge.

On June 6, 2022, SRO Hauge issued her decision. It sustained the Department's appeal in part and dismissed Montalvan's cross-appeal. AR 1–21. As relevant here, SRO Hauge proceeded in two steps.

First, "to the extent that [Montalvan] took issue with the executive decision to close schools" or the Department's decision to "deliver instruction . . . remotely," SRO Hauge held that the state administrative process lacked jurisdiction over the complaint. AR 16. Such decisions, SRO Hauge stated, "are systemic in nature" and thus are outside the scope of administrative review under the IDEA, which focuses on "how to define and treat individual students' learning disabilities." AR 16 (quoting *Levine v. Greece Cent. Sch. Dist.*, No. 08 Civ. 6072 (MAT), 2009 WL 261470, at *9 (W.D.N.Y. Feb. 4, 2009), *aff'd*, 353 F. App'x 461 (2d Cir. 2009)).

Second, SRO Hauge held, to the extent that Montalvan claimed "that the district failed to implement [S.M.'s] IEP," Montalvan had failed to properly exhaust her administrative remedies. AR 18. Citing guidance documents issued by the U.S. Department of Education ("USDOE") and the New York State Education Department ("NYSED"), SRO Hauge held that "concerns concerning the student's regression and compensatory education" as to remote learning must be "raise[d] . . . with the CSE in the first instance." AR 19–20. "[T]he USDOE and NYSED's Office of Special Education have indicated that, under these unique circumstances, a CSE should have the first opportunity to consider the student's needs and whether any additional services may be warranted as a result of the pandemic." AR 20. In SRO Hauge's view, "because the IHO's order alters the procedure that must be followed with regard to compensatory education services arising out a change in the delivery of instruction during the COVID-19 pandemic, it cannot be upheld." AR 21. She thus reversed IHO Glasser's grant of compensatory services. AR 21.

### C.     Procedural History of This Action

On October 6, 2022, Montalvan filed a Complaint in this Court, seeking judicial review of the SRO's decision.  Dkt. 1.  On April 17, 2023, Montalvan filed a motion for summary judgment, Dkt. 22, along with a memorandum of law, Dkt. 23 ("Pl. Br.").  On August 14, 2023, the Department filed a cross-motion for summary judgment, Dkt. 33, and a memorandum of law, Dkt. 35 ("Def. Br.").  On September 11, 2023, Montalvan submitted a reply.  Dkt. 36 ("Pl. Reply").  The Department's reply was due September 25, 2023, but no reply was received.

## II.    Applicable Legal Standards

### A.     Legal Framework

The IDEA requires a state that receives federal education funding to provide all children with disabilities with a FAPE.  20 U.S.C. § 1412(a)(1)(A); *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).  A FAPE should "emphasize[] special education and related services designed to meet [a disabled child's] unique needs and prepare [the child] for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  To accomplish that purpose, the Department must develop an IEP for each disabled child that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see also* 20 U.S.C. § 1414(d)(1)(A); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 415 (2d Cir. 2009).  The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).  It must provide an "appropriate education, not one that provides everything that might be thought desirable by loving parents." *Navarro Carrillo v. N.Y.C. Dep't*

*of Educ.*, No. 21-2639, 2023 WL 3162127, at *3 (2d Cir. May 1, 2023) (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 127 (2d Cir. 1998)).

New York law charges the CSE with developing an IEP for a child with disabilities. N.Y. Educ. Law § 4402(1)(b)(1); *see also R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012); *Walczak*, 142 F.3d at 123. The CSE must consist of student's parents; the student's regular or special education teacher; a school psychologist; a district representative "qualified to provide or administer or supervise special education and . . . knowledgeable about the general curriculum and the availability of resources of the school district"; and an additional parent representative, among others. N.Y. Educ. Law § 4402(1)(b)(1)(a).

When a parent believes that the state has failed to offer his or her child a FAPE, the parent may file a due process complaint and attend a hearing before an IHO. 20 U.S.C. § 1415(b)(6); N.Y. Educ. Law § 4404(1). Such a complaint initiates an "administrative challenge unrelated to the concept of constitutional due process." *R.E.*, 694 F.3d at 175. If the parent's concerns cannot be resolved at a "[p]reliminary meeting," 20 U.S.C. § 1415(f)(1)(B)(i), the matter proceeds to a "due process hearing" before an Impartial Hearing Officer ("IHO"), *id.* § 1415(f)(1)(A); *see also id.* § 1415(f)(3)(A)(i), who must "determin[e] . . . whether the child received a [FAPE]," *id.* § 1415(f)(3)(E)(i); *see also* N.Y. Educ. Law § 4404(1)(a). The IHO's decision is appealable by either party to a State Review Officer ("SRO"), who must "conduct an impartial review" of the IHO's "findings and decision." 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2). "Any party aggrieved by" the SRO's decision "ha[s] the right" to seek judicial review by filing a civil action in state or federal court. 20 U.S.C. § 1415(i)(2)(A); *see also* N.Y. Educ. Law § 4404(3)(a).

### B.    Standard of Review

Summary judgment in the context of an IDEA case "'involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions.'" *R.E.*, 694 F.3d at 184 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)). "The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed.  While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C.*, 553 F.3d at 171 (citations and alterations omitted).  When the decisions of an IHO and a SRO conflict, the Court should generally defer to the SRO's decision as the "'final decision of the state authorities,'" *R.E.*, 694 F.3d at 189 (quoting *A.C.*, 553 F.3d at 171), particularly "when the state officer's review 'has been thorough and careful,'" *id.* at 184.  But when "the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges." *Id.* at 189 (citing *M.H.*, 685 F.3d at 246). SRO and IHO decisions that involve the substantive adequacy of an IEP and educational methodologies are to be given more weight than determinations about the procedure according to which an IEP was developed. *See, e.g.*, *M.H.*, 685 F.3d at 244.

### III.   Discussion

#### A.   State Jurisdiction Over Purportedly "Systemic" Claims

The SRO's ruling turned on her assessment that the claim that S.M. had been denied a

FAPE was not cognizable because the education the Department provided to S.M. during the

pandemic had been the product of "systemic" considerations.  SRO Hauge depicted Montalvan

as challenging the "executive decision to close schools" and/or "the district's actions to deliver

instruction and services to students with disabilities remotely during the closure"—and thus in

substance levying a "systemic" challenge beyond the limited jurisdiction of the IDEA's impartial

hearing process.  AR 16.  As SRO Hauge put the point: "[N]either the IHO nor I have plenary

authority to pass judgment on the Governor's or district policies affecting all students."  AR 16.[8]

In so ruling, SRO Hauge aligned herself with a series of recent rulings by SROs who, in

identical language, have dismissed parents' IDEA claims as non-reviewable which they found to

implicate systemic policy responses to the pandemic.[9]  In verbatim language, each SRO decision

---

[8] The Department's brief does not accurately present this aspect of the SRO's decision.  It states
that SRO Hauge held she lacked jurisdiction to determine whether "a CSE meeting should be
necessary for the relief [Kristie] sought."  Def. Br. at 13; *see also id.* at 12 ("The Court should
affirm SRO Hauge's conclusion that the IHO lacked subject-matter jurisdiction.").  But that
depiction conflates SRO Hauge's two rulings.  The first is that systemic claims are beyond her
jurisdiction.  The second, which is distinct, is that individualized claims related to COVID-19
must be addressed by the child's CSE before a parent initiates administrative proceedings.

[9] *See* Appeal No. 23-070, slip op. at 16 (June 1, 2023); Appeal No. 22-121, slip op. at 14 (Nov.
25, 2022); Appeal No. 22-108, slip op. at 12–13 (Nov. 2, 2022); Appeal No. 22-045, slip op. at
12–13 & n.13 (May 22, 2022); Appeal No. 22-017, slip op. at 16 (May 11, 2022); Appeal No.
22-016, slip op. at 17 (Apr. 25, 2022); Appeal No. 21-241, slip op. at 10 (Jan. 14, 2022); Appeal
No. 21-215, slip op. at 11 (Dec. 20, 2021); Appeal No. 21-210, slip op. at 7–8 (Dec. 8, 2021);
Appeal No. 21-188, slip op. at 14 (Oct. 25, 2021).  SRO decisions are available online. *See*
N.Y.S. Ed., Off. of State Rev., https://www.sro.nysed.gov/decision-search (last accessed Dec. 2,
2023).  The SROs who ruled after the first in this line were not bound by the earlier rulings so
holding, as, under New York law, SRO decisions do not "constitute binding precedent in any
judicial action or proceeding or administrative appeal in any forum whatsoever." N.Y. Comp.
Codes AR & Regs. tit. 8, § 279.12.

has stated that "the executive decision to close schools" and "the district's actions to deliver [remote] instruction and services" are "systemic in nature, and no provision of the IDEA or the [New York] Education Law confers jurisdiction upon a state or local educational agency" to adjudicate such claims. AR 16. As support, each decision has cited *Levine v. Greece Central School District*, No. 08 Civ. 6072 (MAT), 2009 WL 261470 (W.D.N.Y. Feb. 4, 2009), *aff'd*, 353 F. App'x 461 (2d Cir. 2009), for the proposition that "systemic violations" are "to be addressed by the federal courts," whereas "technical questions of how to define and treat individual students' learning disabilities . . . are best addressed by administrators." AR 16 (quoting *Levine*, 2009 WL 261470, at *9).

The SRO's decision to this effect implicates a question of law—"namely, the proper interpretation of the federal statute and its requirements"—and as such the Court does not owe deference to the SRO's ruling. *Mrs. B. ex rel. M.M. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997); *see also, e.g., Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 93–94 (2d Cir. 2005) (finding no deference due to SRO's finding that SRO lacked jurisdiction to adjudicate parent's claims). Exercising *de novo* review, the Court finds the SRO's conclusion—that local authorities were categorically barred from assessing Montalvan's due process complaint that her daughter had been denied a FAPE because the claim implicated systemic considerations—inconsistent with the IDEA's text and the case law applying it.

In passing the IDEA, Congress established a "substantive right" to a free education "to meet [each disabled child's] unique needs." *Endrew F.*, 137 S. Ct. at 390 (quoting 20 U.S.C. § 1401(26)); *see also* 20 U.S.C. § 1400(d)(1)(A). To protect that right, Congress mandated "elaborate and highly specific" procedures that states must follow to ensure "individualized consideration of and instruction for each child." *Rowley*, 458 U.S. at 189, 205. This mandate

does not admit of exceptions or exclusions, let alone on the grounds identified by the SRO here—that is, that state educators were acting pursuant to a gubernatorial mandate. The IDEA requires each state to give parents "an opportunity to present a complaint with respect to *any matter* relating to . . . the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A) (emphasis added). Parents who file such a complaint are entitled to the "written . . . findings of fact and decisions" of an impartial hearing officer. *Id.* § 1415(h)(4). Such "a decision . . . shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education." *Id.* § 1415(f)(3)(E)(i). Upon appeal, a State Review Officer "shall conduct an impartial review of the findings and decision appealed . . . [and] shall make an independent decision [as to the questions appealed] upon completion of such review." *Id.* § 1415(g)(2).

The IDEA's text makes it obligatory, not precatory, for IHOs and SROs to comply with these commands. In statutory construction, it is well-settled that "the mandatory 'shall' . . . creates an obligation impervious to judicial discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). Thus, a parent who "present[s] a complaint with respect to *any matter* relating to" his child's education, 20 U.S.C. § 1415(b)(6)(A) (emphasis added), and abides by the applicable procedural rules in doing so, *see id.* § 1415(f), is entitled to "a determination of whether [his] child received a free appropriate public education," *id.* § 1415(f)(3)(E)(i). In so commanding, the IDEA does not distinguish between parents whose grievances are unique to their children or parents whose grievances are shared by others.

The IDEA's structure underscores the vital role that review by IHOs and SROs plays in vindicating the statutory right to a FAPE. In enacting the IDEA, Congress "intended to do more than merely set out politically self-serving but essentially meaningless language about what

[children with disabilities] deserve at the hands of state . . . authorities." *Pennhurst State Sch. v. Halderman*, 451 U.S. 1, 32 (1981) (Blackmun, J., concurring in part and in the judgment). It instead directed state authorities to enforce the right to a FAPE using particular procedures. As the Supreme Court has put the point: "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, as it did upon the measurement of the resulting IEP against a substantive standard." *Rowley*, 458 U.S. at 205–06 (citations omitted). Congress thus "chose[] to legislate the central components of due process hearings," rather than leave such matters to the discretion of local authorities, *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 54 (2005), and to further legislate important procedural components of these hearings, *see, e.g.,* 20 U.S.C. § 1415(f)(1) (notice); *id.* § 1415(f)(2) (disclosures); *id.* § 1415(f)(3) (limitations on who may conduct the hearing); *id.* § 1415(g) (right to appeal); *id.* § 1415(h)(1) ("right to be accompanied and advised by counsel"); *id.* § 1415(h)(2) ("right to present evidence and confront, cross-examine, and compel the attendance of witnesses"); *id.* § 1415(h)(3) (right to a transcript of the proceeding); *id.* § 1415(h)(4) ("right to written . . . findings of fact and decisions"); *id.* § 1415(i)(2)(A) (right to review in federal court). The IDEA's "'cooperative federalism'" thus "leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, but imposes significant requirements to be followed in the discharge of that responsibility." *Schaffer*, 546 U.S. at 52 (cleaned up).

"[T]he importance Congress attached to these procedural safeguards cannot be gainsaid." *Rowley*, 458 U.S. at 205. The statute does not provide any charter for eluding them—or avoiding altogether the question whether a child has been denied the substantive right to a FAPE—where the educational program offered the child was influenced by broader state policy considerations.

Put differently, no matter how well-intentioned, or advisable on public health grounds, the move to remote education may have been, a parent of a student entitled to a FAPE under the IDEA is entitled to a reasoned determination by state authorities using statutorily prescribed procedures as to whether the child in fact received a FAPE.

The caselaw is in accord. The Second Circuit's decision in *Lillbask ex rel. Mauclaire v. Connecticut Department of Education*, 397 F.3d 77 (2d Cir. 2005) is particularly instructive. The SRO there held that she lacked jurisdiction to review whether the student's IEP adequately addressed her "safety needs," as such fell outside her limited "special education" domain. *Lillbask ex rel. Mauclaire v. Sergi*, 117 F. Supp. 2d 182, 197 (D. Conn. 2000), *rev'd sub nom.*, 397 F.3d 77 (2d Cir. 2005). Reversing, the Second Circuit rejected that conclusion and held such complaints to fall within state administrative jurisdiction and to require state administrative adjudication. The IDEA, the Circuit emphasized, affords parents "an opportunity to present complaints with respect to *any matter* relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Lillbask*, 397 F.3d at 93 (emphasis in original) (quoting 20 U.S.C. § 1415(b)(6)). "This broad language," the Circuit stated, "suggests that Congress did not intend to exclude from consideration any subject matter . . . that could interfere with a disabled child's right to receive a free appropriate public education." *Id.* The Circuit's reasoning applies whether the decision taken by state authorities affects one child or many.

Consistent with this principle, precedent reflects decisions by SROs hearing claims—and where finding IDEA violations, acting to redress them—arising from broadly applicable policies. These include IDEA violations deriving from a school district's categorical refusal to translate documents into Spanish or hire interpreters, *see H.P. v. Bd. of Educ.*, 385 F. Supp. 3d 623, 634–

35 (N.D. Ill. 2019), a school district's failure to enact a policy to proactively identify disabled

children eligible for special education programming, *see D.L. v. District of Columbia*, 450 F.

Supp. 2d 11, 14 (D.D.C. 2006), and, apposite here, a school district's decision to utilize virtual

instruction for all students during a pandemic, *see, e.g., E.E. ex rel. Hutchinson-Escobedo v.*

*Norris Sch. Dist.*, No. 20 Civ. 1291 (AWI) (CDB), 2023 WL 3124618, at *13 (E.D. Cal. Apr. 27,

2023). As these decisions reflect, it is not unusual for a claim that an individual child did not

receive a FAPE to arise from a practice or policy of broader application, whether born of limited

budgets, problematic programmatic decisions, disputable resource allocation, or, as here, the

urgent challenges presented by a pandemic.

There are, of course, limits to the relief that may be ordered under the IDEA, but those

limits derive from its provision for individualized, as opposed to collective, remedies. They do

not derive from any limitation on the factors that may have caused the child to be denied a FAPE

and hence entitled to a remedy. "A focus on the particular child is at the core of the IDEA."

*Endrew F.*, 137 S. Ct. at 999. As the Supreme Court has explained, administrative officers and

courts have "broad discretion" to grant relief, but such relief must "be 'appropriate' in light of

the purpose of the Act," which is to ensure that the disabled child be given "'a free public

education which emphasizes special education and related services designed to meet [his or her]

unique needs.'" *Burlington Sch. Comm. v. Mass. Dep't of Educ.*, 471 U.S. 359, 369 (1985). The

parameters of a FAPE will, by necessity, differ for each child. "[C]areful consideration" must be

given to "the child's present levels of achievement, disability, and potential for growth." *Endrew*

*F.*, 137 S. Ct. at 999. The remedy where a child has been denied a FAPE must likewise be

individually tailored. But in every case, the remedial "aim [is] to place [the] disabled child[] in

the same position [he or she] would have occupied but for the school district's violations of

IDEA." *Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 518 (D.C. Cir. 2005) (Tatel, J.); *see also Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 457 (2d Cir. 2015). IHOs and SROs thus are to craft remedies keyed to the individual child, not children state- or district-wide. This principle delimits remedial authority, whether the remedy sought would entail "changes to a student's program," *Polera v. Bd. of Educ.*, 288 F.3d 478, 483 (2d Cir. 2002), call upon the "school district to fund [additional] education" or related services, *Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 109 n.2 (2d Cir. 2008), or direct reimbursement of a parent's "expenditures on private special education," *Burlington*, 471 U.S. at 369. The core principle under the IDEA that remedies are individualized in turn limits the risk, which the IDEA might otherwise present, of unwarranted "[j]udicial interposition in the operation of the public school system of the Nation." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).[10]

In declining to adjudicate Montalvan's claim on behalf of S.M., the SRO here invoked the "systemic violation" exception to administrative exhaustion. AR 16 (citing *Levine*, 2009 WL 261470, at *9). But that aspect of IDEA doctrine, and the precedent which the SRO cited, is addressed to a different context: one in which collective challenges are brought and collective relief is sought.

As the Second Circuit has explained, although plaintiffs seeking relief for the denial of a FAPE "generally must exhaust their administrative remedies before filing suit in federal court," *Polera*, 288 F.3d at 481, where "claims of generalized [IDEA] violations" are made on behalf of

---

[10] For an example of relief granted in a state administrative proceeding under the IDEA that was found excessive, *see Alex AR ex rel. Beth AR v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 614 (7th Cir. 2004) ("[T]he imposition of a 'disability awareness and sensitivity curriculum' that had to be taught to *every* student in *every* school in the District, regardless of how unconnected those students and schools may have been to [the child's] situation, could not possibly have helped to remedy any denial of [the child's] rights under the IDEA.").

a collection of disabled children, a federal court may address such claim absent administrative

exhaustion, because such claims "lend themselves well" to the kind of "class action treatment"

that state administrative proceedings cannot facilitate, *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386

F.3d 107, 113 (2d Cir. 2004). Such suits "often [involve] challenge[s] [to] policies that concern

the administrative dispute-resolution mechanism itself." *T.AR v. Sch. Dist. of Phila.*, 4 F.4th

179, 192 (3d Cir. 2021); *see, e.g., Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 159 (2d Cir.

1992) (exhaustion not required in challenge to the selection process for hearing officers).

     But the fact that a federal court is available to hear claims brought on behalf of a

collective does not mean that state administrative tribunals are barred—or may abstain—from

hearing claims by an individual parent of a FAPE denial that implicates broader policies. The

systemic violation exception recognizes that there is no purpose in requiring plaintiffs to exhaust

remedies "when the plaintiff challenges conduct that administrative remedies, which focus on the

individual needs of particular students, have 'no power to correct.'" *Levine*, 353 F. App'x at 465

(citation omitted). The "systemic violation" exception makes an effective forum available to

parents to press generalized claims, one which does not oblige each to administratively exhaust

state procedures. *See Porter v. Bd. of Trs.*, 307 F.3d 1064, 1071 (9th Cir. 2002) (comparing the

weak "institutional interests favoring exhaustion" in such cases with the "complainant's interest

in retaining prompt access to a judicial forum"); *see also T.R.*, 4 F.4th at 192–93. That rationale

does not justify depriving a parent like Montalvan access to relief via the familiar administrative

process the IDEA puts in place. Montalvan's individualized claim does not seek relief that an

SRO is incapable of awarding. Rather, Montalvan seeks a finding that S.M. was "den[ied]" a

FAPE, and as a remedy, an "extensive independent evaluation" of S.M. "to determine the need

for compensatory services," and a remedial order requiring the Department to provide S.M. with

such services. AR 708–09. Montalvan's bid for individualized relief for her daughter thus is well within the heartland of IDEA claims.

Levine, on which the SRO here relied, is not at all to the contrary. In Levine, the parent plaintiff failed to exhaust his administrative remedies before filing suit, and sought to excuse this failure on the basis that he "allege[d] 'systemic violations' of IDEA." 2009 WL 261470, at *7. The local school district, he argued, had "a policy and practice of denying [a] FAPE to students placed" in the child's program, such that administrative procedures would fail to "cure[]" the violation he alleged. Id. Judge Telesca rejected that argument. The plaintiff's basic claim, he held, was familiar: that he had been denied a FAPE. See id. at *5–6. Such a claim presented "precisely the kinds of factual issues that are best left to the expertise of the involved agencies rather than the courts." Id. at *6 (cleaned up). That the plaintiff "allege[d] [the violations] were shared by other students of the District," he explained, was not a basis to treat the state administrative process as futile or to empower the court to hear the claim in the first instance. Id. at *9. Judge Telesca acknowledged that a different rule applies for "systemic violations," like "inadequate educational programs and facilities"; in such cases, "the purposes of exhaustion . . . are unavailing," and federal courts can step in to correct a "district's dereliction of its duties." Id. at *8–9 (cleaned up). But in all other cases, a federal court must stay its hand, in deference to state and local procedures. See id. at *9. In a summary order, the Second Circuit adopted Judge Telesca's reasoning. It held that the plaintiff, at bottom, "challenge[d] the [school district] treatment of him individually." Levine, 353 F. App'x at 465. Such a claim, the Circuit explained, was cognizable through the administrative process, even if such processes could not address the "larger problems" he claimed afflicted all "students with special needs" in his school district. See id. at 465–66.

The decisions by the district court and Second Circuit in *Levine* favor Montalvan here. She pursues individualized relief for S.M. And as *Levine* teaches, even where a claim for individualized relief is based on a FAPE denial attributable to school- or district-wide violations of the IDEA, such claims benefit from "the exercise of discretion and educational expertise by state and local agencies." *Levine*, 2009 WL 261470, at *8 (quoting *Handberry v. Thompson*, 436 F.3d 52, 61 (2d Cir. 2006)); *see also N.J. v. N.Y.C. Dep't of Educ.*, No. 18 Civ. 6173 (JMF), 2021 WL 965323, at *12 (S.D.N.Y. Mar. 15, 2021).

In sum, "[b]y refusing to adjudicate [this] case[] on the false premise that [she] lacked power to hear [it]," *Union Pac. R.AR Co. v. Bhd. of Locomotive Eng'rs*, 558 U.S. 67, 75 (2009), the SRO here failed to discharge her fundamental obligation under the IDEA: to "decid[e] . . . on substantive grounds . . . whether [S.M.] received a free appropriate public education," 20 U.S.C. § 1415(f)(3)(E)(i). The Court rejects the SRO's rationale that claims of FAPE denials that implicate systemic considerations, like the delivery of remote instruction and services to students with disabilities during the pandemic, are categorically beyond the jurisdiction of the IDEA's impartial hearing process to individually remedy. Provided that the remedy sought is one that an SRO has the power to award and that the parent has otherwise complied with the IDEA's dictates, the SRO is obliged to address such claims.

## B.      Exhaustion of State Administrative Remedies

SRO Hauge's alternative holding was that, even if a FAPE-denial claim were viable, a parent is required to raise "concerns concerning the student's regression [during remote learning] and compensatory education" "with the CSE in the first instance," as opposed to bringing a claim before an IHO of denial of a FAPE. AR 19–20. "[T]he USDOE and NYSED's Office of Special Education," the SRO stated, "have indicated that, under these unique circumstances, a CSE

should have the first opportunity to consider the student's needs and whether any additional services may be warranted as a result of the pandemic." AR 20.  In S.M.'s case, the SRO noted, "there is no indication that a CSE has conducted such a review, nor is there any indication that the parent requested that the CSE conduct such a review." AR 20.  "Accordingly," she concluded, "the IHO erred in ordering compensatory education at this juncture," because IHO Glasser in effect "alter[ed] the procedure that must be followed with regard to compensatory education services arising out a change in the delivery of instruction during the COVID-19 pandemic." AR 21.  The Department agrees.  It urges dismissal on this ground of Montalvan's due process complaint.  Def. Br. at 7–10.

For two reasons, Montalvan has the better of this argument.

First, as she notes, the SRO was factually wrong to state that there is no "indication that [Montalvan had] requested that the CSE conduct . . . a review." AR 20; *see also* Def. Br. at 12 (same).  In fact, Montalvan's bid for relief expressly sought the convening of a new CSE as an early step in the process of remedying the FAPE denial she alleged.  Her due process complaint stated: "After the extensive independent evaluation has been completed, the Parent is requesting the School District promptly conduct a new Committee on Special Education/IEP Meeting to review the updated evaluation and make any appropriate changes to the Student's IEP." AR 708–09.  In depicting Montalvan as seeking to end-run the vital role of a CSE in assessing S.M. educational needs in light of the asserted FAPE denial, the SRO misapprehended the due process complaint.[11]

---

[11] In dismissing on this ground, the SRO used *verbatim* the language of earlier SROs who had dismissed due process complaints seeking compensatory education based on the impact of remote instruction on their child's education. *See, e.g.*, Appeal No. 23-081, slip op. at 16–17 (July 14, 2023); Appeal No. 23-070, slip op. at 19–20 (June 1, 2023); Appeal No. 23-028, slip op. at 23–24 (Apr. 13, 2023); Appeal No. 22-121, slip op. at 16–17 (Nov. 25, 2022); Appeal No.

Second, and more fundamentally, no statute or regulation required Montalvan to seek a CSE meeting before seeking relief through the administrative process for the FAPE denial she claimed.[12] In concluding otherwise, the SRO cited a guidance document issued by the New York State Department of Education's Office of Special Education. *See* N.Y.S. Dep't of Special Ed., *Compensatory Services for Students with Disabilities as a Result of the COVID-19 Pandemic* (June 2021) [hereinafter, "*Compensatory Services*"].[13] The relevant language from that document is as follows:

> Where, as a result of COVID-19, there has been a delay or disruption in the provision of special education programs and services, Committees on Preschool Special Education and Committees on Special Education are reminded of their responsibility to make an individualized determination as to whether and to what

---

22-108, slip op. at 14–15 (Nov. 2, 2022); Appeal No. 22-094, slip op. at 14–15 (Oct. 11, 2022); Appeal No. 22-058, slip op. at 32–33 (July 8, 2022); Appeal No. 22-031, slip op. at 19–20 (June 6, 2022); Appeal No. 22-017, slip op. at 17–18 (May 11, 2022); Appeal No. 22-016, slip op. at 18–19 (Apr. 25, 2022); Appeal No. 21-213, slip op. at 22–23 (Feb. 9, 2022); Appeal No. 21-207, slip op. at 38–39 (Feb. 4, 2022); Appeal No. 21-244, slip op. at 33–34 (Jan. 20, 2022); Appeal No. 21-241, slip op. at 13–14 (Jan. 14, 2022); Appeal No. 21-215, slip op. at 12–13 (Dec. 20, 2021); Appeal No. 21-210, slip op. at 10–11 (Dec. 8, 2021). Like the above 16 opinions, the SRO stated that there was no "indication that the parent requested that the CSE conduct . . . a review." AR 20. In fact, as noted, that was wrong. *See* AR 708–09.

[12] Nor, contrary to the Department's defense of this decision, was there a jurisdictional barrier to review. Def. Br. at 14. Jurisdiction "is a word of many, too many, meanings." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (cleaned up); *see also, e.g.*, *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 566 (2d Cir. 2016). The Supreme Court "has emphasized the distinction between limits on 'the classes of cases a court may entertain (subject-matter jurisdiction)' and 'nonjurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times.'" *Wilkins v. United States*, 143 S. Ct. 870, 875–76 (2023) (quoting *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1849 (2019)). Even if New York had required that a parent request a CSE meeting before she file a due process complaint—which it has not—such a requirement would not necessarily be jurisdictional.

[13] *See* Albert Decl., Ex. 2. The guidance document is available online at: https://www.p12.nysed.gov/specialed/publications/2021-memos/compensatory-services-for-students-with-disabilities-result-covid-19-pandemic.pdf. Because the guidance document lacks consistent internal numbering, the Court cites here to the Bates-stamps on the exhibit.

extent compensatory services may be needed for a student with a disability to make up for any skills that may have been lost when FAPE could not be provided.

. . .

*What options do parents have if they disagree with a Committee's decision not to provide compensatory services or with the amount and/or type of services recommended?*

Parents of students with disabilities may resolve disputes with school districts regarding the provision of FAPE by pursuing one of the dispute resolution options provided for in the IDEA.  A parent may file a State complaint directly with NYSED in accordance with Commissioner's Regulation section 200.5(l), request mediation in accordance with Commissioner's Regulation section 200.5(h), or file a due process complaint and proceed to hearing in accordance with Commissioner's Regulation section 200.5(j).

*Id.* at 2, 8 (emphasis in original); *see also* N.Y.S. Dep't of Special Ed., *Supplement #2— Provision of Services to Students with Disabilities During Statewide School Closures* at 6 (June 20, 2020) [hereinafter, "*Supplement #2*"] (offering similar guidance).

For two reasons, the SRO's construction of the guidance document was erroneous.

First, the guidance document is clear on its face that it does not purport to impose an exhaustion requirement.  It "remind[s]" CSEs "of their responsibility to make an individualized determination" whether students are entitled to "compensatory services" in circumstances "when FAPE could not be provided." *Compensatory Services* at 1; *see also Supplement #2* at 1 (CSEs "will need to consider newly identified needs when determining the appropriate special programs and services to be recommended" for the next school year).  And it sets out various "dispute resolution options" for a parent who "disagree[s] with a Committee's decision" as to their child's entitlement to such services. *Compensatory Services* at 8.  But nowhere does it state that a parent must go first to her child's CSE to seek compensatory services before pursuing relief via the IDEA's impartial hearing processes, or that such processes are foreclosed *unless* the parent has first gone to the CSE.  By regulation, a CSE "shall arrange for an appropriate reevaluation"

of a student "if the school district determines that the [student's] educational or related services needs . . . warrant a reevaluation or if the student's parent or teacher requests a reevaluation." 8 N.Y.C.R.AR § 200.4(b)(4). The Department's recommendation that parents utilize such a process in the first instance is unobjectionable. But the availability of such a procedure does not make it obligatory. *See Jeremy H. ex rel. Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 283 n.20 (3d Cir. 1996).

Had the guidance document forbidden the parent from pursuing IDEA remedies without going back to the child's CSE, such would have conflicted with the Department's regulations. Consistent with the IDEA, these provide: "A parent . . . may file a due process complaint with respect to any matter relating to . . . the provision of a free appropriate public education to [a] student [with a disability]." 8 N.Y.C.R.AR § 200.5(i)(1). The guidance document does not cite this provision. Underscoring its precatory quality, it states that it is just "one in a series of policy briefs . . . intended to assist school districts and parents" and "is not intended to and does not provide legal advice." *Compensatory Services* at 4. The document's encouragement to parents to return first to the CSE cannot be taken as an attempt to bind those parents. *Cf. State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 506 (2d Cir. 2004) (state agencies are not "empower[ed] . . . to rule by informal advisory opinion" (quoting *Park Radiology P.C. v. Allstate Ins. Co.*, 769 N.Y.S.2d 870, 873 n.2 (Civ. Ct. 2003)). The Department's premise—that an imposition of an exhaustion rule would fall within New York's authority to establish administrative procedures, Def. Br. at 14—thus fails at threshold, as the New York has not imposed any such rule.

Second, had the guidance document forbade parents from filing IDEA due process complaints without first returning to the CSE, such an edict would have fit uncomfortably at best

with the IDEA's statutory structure.  As the Second Circuit has stated: "While state procedures which more stringently protect the rights of the handicapped and their parents are consistent with the [IDEA] and thus enforceable, those that merely add additional steps not contemplated in the scheme of the Act are not enforceable." *Antkowiak ex rel. Antkowiak v. Ambach*, 838 F.2d 635, 641 (2d Cir. 1988) (citations omitted); *see also Town of Burlington v. Department of Educ.*, 736 F.2d 773, 780 (1st Cir. 1984) (states may not establish procedures "inconsistent with the federally-mandated" scheme), *aff'd*, 471 U.S. 359 (1985).  Other circuits are in accord.  The "clear congressional demarcation of an end point to the due process procedures," the Ninth Circuit has stated, "weighs heavily [to the] conclusion that Congress did not intend to allow states to add additional exhaustion requirements not identified in the statute." *Porter*, 307 F.3d at 1071; *see also Jeremy H.*, 95 F.3d at 282–83 & n.20 (rejecting proposition that parents must exhaust additional remedies offered by a state before filing a due-process complaint under the IDEA).  That the IDEA allows state "educational agenc[ies]" to "establish and maintain procedures" to ensure "the provision of a free appropriate public education," 20 U.S.C. § 1415(a), does not, by any means, clearly authorize a state to impose a new entry barrier to seeking relief under the IDEA for the denial of a FAPE.

As a matter of policy, there may well be "some merit in encouraging resort to the [CSE] to allow [New York] to correct problems before litigation and to further develop administrative records for judicial review," but there was neither a statutory nor a regulatory charter for the SRO, based on "policy analysis," to require this manner of exhaustion as a predicate to a due process complaint. *Porter*, 307 F.3d at 1070.  The Court thus rejects the SRO's conclusion that S.M.'s CSE must meet before her parent, Montalvan, may litigate, and if established seek relief for, the denial of a FAPE through state administrative processes followed by judicial review.

### C.      Remedy

The Court thus holds that Montalvan, having filed a due process complaint, was entitled

to a state administrative decision that determined "on substantive grounds . . . whether [S.M.]

received a free appropriate public education." 20 U.S.C. § 1415(f)(3)(E)(i).  Although the IHO's

language was equivocal, it ultimately found that S.M. had received a FAPE, but, on Montalvan's

appeal of that ruling, the SRO declined to rule.  The Court accordingly remands this case to the

SRO for further consideration, staying this action in the meantime.  *See Shapiro v. Paradise*

*Valley Unified Sch. Dist. No. 69*, 152 F.3d 1159, 1161 (9th Cir. 1998) (a district court must stay

action upon remand to an SRO).

In so doing, the Court notes an apparently developing split among circuit courts as to

whether district courts may remand for further proceedings before state education agencies.

*Compare Johnson v. Charlotte-Mecklenburg Sch. Bd. of Educ.*, 20 F.4th 835, 845 (4th Cir. 2021)

(holding such remands impermissible), *with, e.g., Shapiro v. Paradise Valley Unified Sch. Dist.*

*No. 69*, 152 F.3d 1159, 1161 (9th Cir. 1998) (ordering such a remand), *and Carlisle Area Sch. v.*

*Scott P. ex rel. Bess P.*, 62 F.3d 520, 526 (3d Cir. 1995) (approving such a remand).  In *E.M. v.*

*New York City Department of Education*, 758 F.3d 442 (2d Cir. 2014), the Second Circuit

approved of such remands, suggesting that the district court in that case could remand if it "needs

further clarification or does not have sufficient guidance from the administrative agencies." *Id.*

at 463 (quoting *T.L. v. N.Y.C. Dep't of Educ.*, 938 F. Supp. 2d 417, 436 (E.D.N.Y. 2013)); *see*

*also E.H. v. N.Y.C. Dep't of Educ.*, 611 F. App'x 728, 732 (2d Cir. 2015) (directing district court

to remand to SRO for further proceedings).[14]

---

[14] Explaining its outcome, the Fourth Circuit has noted that a district court in an IDEA case does
not "affirm, reverse, or vacate the decision of the state administrative agency." *Johnson*, 20
F.4th at 845 (quoting *Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d 380, 384 (4th Cir.

This Court, heeding the Second Circuit's lead, finds remand appropriate here. Remand is particularly advisable given the nature of the decisions below. Although ultimately stating that "the District did in fact provide a FAPE to [S.M.] from March 2020 through the 2020/2021 school year," AR 52, the IHO stated, seemingly inconsistently, that "the classes and services missed by [S.M.] during the Summer of 2020 add up to more than a 'handful' of sessions, and thus the denial of FAPE is more than *de minimis*," AR 48. And the SRO, finding a lack of jurisdiction, avoided the ultimate question altogether. Under these circumstances, a remand to the state administrative officers to engage with, and clearly resolve, that question is warranted. The alternative, in which this Court would assess Montalvan's FAPE claim, is inadvisable, given the IHO's internally contradictory ruling and the SRO's declination to rule. Although the Court "appreciate[s] the[] desire to resolve this case now without further litigation, . . . [i]t would be imprudent for this [Court], without any educational expertise, to decide the merits of [S.M.'s] claim on a cold record." *E.M.*, 758 F.3d at 463.

On remand, the Court expects the SRO to give focused attention to Montalvan's claim that the Department's implementation of S.M.'s IEP during the COVID-19 period was not equal to the task of satisfactorily educating S.M. *See, e.g., Aja N. v. Upper Merion Area Sch. Dist.*, No. 21 Civ. 4234 (JRP), 2022 WL 3371612, at *5 (E.D. Pa. Aug. 16, 2022) (noting that "even in

---

2000)). Instead, it has jurisdiction over an original "civil action," in which it "receive[s] the records of the administrative proceedings," must "hear additional evidence at the request of a party," and then renders a "decision on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2). Although this argument has some force, as the courts to hold otherwise have noted, a district court is empowered to "grant such relief" as it "determines is appropriate," *id.* § 1415(i)(2)(C)(iii), and, under the IDEA, any "final[ity]" attached to the state decision is expressly subject to "a[] [civil] action" in federal court, *id.* § 1415(i)(1)(B). Such provisions thus suggest broad remedial latitude for district courts—including to order further proceedings before the state officials who are "uniquely well suited to review the content and implementation of" educational programs. *Polera*, 288 F.3d at 487.

times of emergency, the IDEA itself requires school districts to provide FAPEs," and affirming SRO's award of compensatory education based on the "limited instruction" the student received during the pandemic); *see also E.E. ex rel. Hutchinson-Escobedo*, 2023 WL 3124618, at *13 (affirming similar award); *A.D. v. Upper Merion Area Sch. Dist.*, No. 21 Civ. 5468, 2022 WL 16553379, at *7 (E.D. Pa. Oct. 28, 2022) (ordering similar award); *T.H. ex rel. T.B. v. DeKalb County Sch. Dist.*, 564 F. Supp. 3d 1349, 1353 (N.D. Ga. 2021) (same). The Department has recognized in its guidance documents the enduring nature of a school's duty to provide a disabled child a FAPE. *See Compensatory Services* at 5 (although students are not "automatically entitled to compensatory services" due to remote instruction, students whose "needs [are] so complex that they were not able to participate in or benefit from special education programs" are entitled to the "compensatory services that may be necessary to address a loss of skills"). The SRO is at liberty to remand to the IHO for further evidentiary proceedings, and clarification of her earlier opinion, if found warranted. The Court expects the SRO to address Montalvan's claims sensitive to the developing case law, some canvassed above, involving claims of FAPE denials during the period of remote instruction.[15]

## CONCLUSION

For the foregoing reasons, the Court grants Montalvan's motion in part, holding that the SRO erred in failing to consider her claim on the merits, and remands to the SRO for a determination of whether S.M. received a FAPE during the 2019–20 school year.

---

[15] *See also, e.g., Charles H. v. D.C.*, No. 21 Civ. 997 (CJN), 2021 WL 2946127, at *3, *9 (D.D.C. June 16, 2021); *E.E. ex rel. Hutchinson-Escobedo*, 2023 WL 3124618, at *13; *A.D.*, 2022 WL 16553379, at *7; *Aja N.*, 2022 WL 3371612, at *5; *cf. Hernandez v. Grisham*, 508 F. Supp. 3d 893, 1005 (D.N.M. 2020).

The Clerk of Court is respectfully directed to terminate all pending motions and to stay this case pending resolution of proceedings on remand.  The parties are ordered to advise the Court within 14 days of the issuance of any substantive decision or order by the SRO or IHO.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: December 18, 2023
New York, New York